IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| BRINKER MANUFACTURING JEWELERS, INC. D/B/A BRINKER'S JEWELERS and SOUTH CENTRAL COMMUNICATIONS CORPORATION D/B/A SOUTH CENTRAL DIGITAL, <br><br> Plaintiffs, <br><br> v. <br><br> ROGERS GALLERIA JEWELERS, LLC D/B/A THE DIAMOND GALLERIA BY ROGERS, TYNA WHEAT, and SHARON SARTORE, <br><br> Defendants. | Case No. 3:14-cv-134 |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Brinker's Manufacturing Jewelers, Inc. d/b/a Brinker's Jewelers ("Brinker's"), and South Central Communications Corporation d/b/a South Central Digital ("South Central Digital") (collectively, Brinker's and South Central are "Plaintiffs"), by counsel, Ziemer, Stayman, Weitzel & Shoulders, LLP, for their Complaint against Defendants, Rogers Galleria Jewelers, LLC d/b/a The Diamond Galleria by Rogers ("Rogers"), Tyna Wheat, and Sharon Sartore (collectively, the "Defendants"), allege and state:

## INTRODUCTION

Plaintiffs bring this action seeking to put an immediate stop to, and to obtain redress for, Defendants' blatant and extreme violations of federal copyright and trade dress and unfair competition law and Indiana statutory and common law with regard to Brinker's intellectual property rights, business relationships, goodwill and business reputation.

1

In recent years, recognizing Brinker's continued success in the local market, Rogers has repeatedly copied Brinker's advertising marketing and branding including copying the design of Brinker's showroom and jewelry boxes, interfering with Brinker's exclusive vendor contracts, and copying and/or plagiarizing multiple Brinker's taglines and written advertisements. In perhaps the most egregious example of Rogers tortious actions, Rogers copied Brinker's website to such a degree that on one page of Rogers's website it states, "When buying any diamond, contact a *Brinker's* expert!" (*See* Exhibit A)

Through their blatant copying of Brinker's, the Defendants are clearly attempting to create confusion in the marketplace to the detriment of both Brinker's and consumers. The Defendants' conduct is causing, and unless immediately enjoined, will continue to cause extreme and irreparable harm to Brinker's.

The Defendants cannot continue to exploit Brinker's original advertising ideas and protected copyright and trade dress and expect no repercussions. The Defendants' conduct must immediately be stopped and Plaintiffs must be fully compensated for the Defendants' willful acts of copyright and trade dress infringement, unfair competition, deceptive trade practices, conversion, misappropriation, and tortious interference with contract and/or business relationship.

**PARTIES, JURISDICTION, AND VENUE**

1.      This is a civil action seeking damages and injunctive relief for copyright infringement, trade dress infringement, injury to business reputation, unfair competition and deceptive trade practices, conversion, misappropriation of advertising ideas and style of doing business, and tortious interference with contract and/or business relationship.

2. This Court has jurisdiction over this action pursuant to 17 U.S.C. § 101, et seq., 28 U.S.C. § 1331, 28 U.S.C. § 1338(a) and (b), and 28 U.S.C. § 1367.

3. Brinker's is a corporation duly organized and existing under the laws of the State of Indiana, with its principal place of business in Evansville, Indiana.

4. South Central Digital is a corporation organized and existing under the laws of the State of Indiana, with its principal place of business in Nashville, Tennessee.

5. Rogers is a limited liability company organized and existing under the laws of the State of Indiana, with its principal place of business in Evansville, Indiana.

6. Tyna Wheat is an individual, who, upon information and belief, resides in Henderson, Kentucky and who works and owns the Defendant business, Rogers, which is located in this District. Upon information and belief, Tyna Wheat is the President of Rogers.

7. Sharon Sartore is an individual, who, upon information and belief, resides in Henderson, Kentucky and who works and owns the Defendant business, Rogers, which is located in this District. Upon information and belief, Sharon Sartore is the Chief Executive Officer of Rogers.

8. Upon information and belief, at all times mentioned in the Complaint, each of the Defendants was the agent and/or alter ego of each of the other Defendants, and in doing the things alleged in this Complaint, was acting within the course and scope of such agency.

9. This Court has personal jurisdiction over the Defendants, and venue in this District is proper under 28 U.S.C. § 1391(b) and 28 U.S.C. § 1400(a), in that the principal place of business of Rogers is within this District, the acts complained of herein occurred in this District, and the damages inflicted upon Plaintiffs occurred in this district and the surrounding geographical area.

**GENERAL ALLEGATIONS**

10. Plaintiffs incorporate herein by reference each and every allegation contained in each paragraph above.

11. Brinker's is a successful jewelry store that has operated in Evansville, Indiana, since 1972.

12. Brinker's has won numerous awards in the Evansville area for its services, including being voted "Best Jewelry Store" by the *Evansville Courier and Press* from 2004-2012 and being named "Best Jewelry Store" by *Evansville Living* magazine in 2004, 2005, 2006, 2013, and 2014.

13. Rogers opened a store called The Diamond Galleria by Rogers in 2013.

14. The Brinker's showroom is approximately 2.7 miles from the Diamond Galleria in Evansville, Indiana.

15. In recent years both prior to and subsequent to the opening of the Roger's Diamond Galleria, Brinker's has expended substantial sums of money in branding efforts to further set itself apart from competitors, which now include Rogers.

16. Brinker's has been recognized by jewelry trade magazines for its marketing efforts. *See* Exhibit B, INSTORE Magazine, p. 5 ("Brinker's is not stranger to the Benchmarks page, and for good reason. Their marketing materials consistently set a stylish, sophisticated, but approachable tone…").

Jewelry Boxes

17. As part of these branding efforts, in 2011 Brinker's hired Bufkor to design Brinker's jewelry boxes to contain a hanging "B" tab on them. *See* Exhibit C.

18. Brinker's paid a substantial sum of money for the new design of its boxes.

4

19. Rogers copied Brinker's box design by designing its own boxes to have a hanging "R" on them. *See* Exhibit D.

20. Upon information and relief, a vendor of Brinker's who had approached Rogers seeking to quote the production of Rogers' jewelry boxes advised Rogers that the box Rogers intended to use was the Brinker's specific designed jewelry box. Upon information and belief, the Defendants advised the vendor that they obtained the box from Bufkor, knew it was very similar to Brinker's jewelry box, but intended to use it anyway.

21. Upon information and belief, the jewelry box vendor advised the Defendants that it was legally improper for them to utilize the same box design as Brinker's and that as a result the vendor would be unable to provide a quote or provide Roger's with its jewelry boxes.

22. The Defendants continue to utilize the jewelry boxes pictured in Exhibit D despite their actual knowledge that the jewelry boxes are a copy of the jewelry boxes that Brinker's designed (see Exhibit C) and which Brinker's used prior to Rogers beginning to use substantially similar jewelry boxes and which Brinker's continues to use in furtherance of its branding and marketing efforts.

Showroom Design

23. In 2010-2011, Brinker's hired Artco Group ("Artco") and Y Factor Studio to redesign its showroom, including the redesign of its jewelry showcases.

24. At the time Brinker's hired Artco, ArtCo had never before worked in the local market in or near Evansville, Indiana.

25. In working with Brinker's on this redesign, Artco provided Brinker's with several sample layouts and designs from which to choose.

26. Brinker's elected not to use any of the sample layouts or designs, instead working directly with ArtCo to incorporate new and original ideas into the design.

27. Brinker's paid Artco a substantial sum of money for the redesign of its showroom.

28. Brinker's also paid Y Factor Studio a substantial sum of money for interior design ideas, including showroom layout, patterns, color schemes, and lighting elements.

29. When Rogers opened its Diamond Galleria store in 2013, it hired Artco to be its showroom designer and Y Factor Studio to serve as its interior decorator.

30. Rogers copied the layout and design of the Brinker's showroom, including many original ideas that had been exclusively requested by Brinker's and even incorporated the exact same laminate color and design on the showcases in its showroom as Brinker's utilizes in its showroom.

31. The laminate color was exclusively requested by Brinker's as a change to the sample layouts and designs provided to it by ArtCo during Brinker's redesign.

32. The designs were so similar that after the Rogers showroom design was completed, Artco sent Brinker's the Rogers bill by mistake.

<u>The Defendants' Visits to the Brinker's Store and Efforts to Improperly Secure Exclusive Brands Carried by Brinker's</u>

33. Immediately prior to and subsequent to the opening of Roger's Diamond Galleria, Wheat and/or Sartore or other Rogers's agents have visited the Brinker's showroom with notebooks on several occassions.

34. Upon information and belief, during the visits to Brinker's, Wheat and/or Sartore or other Rogers agents took notes about Brinker's selection, products and brands offered for sale, store design and layout, and/or the Brinker's overall shopping experience.

35. Until 2013, Brinker's had contracts with both LeVian and AJaffe that stated that Brinker's was to have an exclusive right to sell LeVian and AJaffe products locally, with one exception to the exclusivity being if the products were to be carried by a chain jewelry store.

36. Until 2013, Brinker's was the only locally owned and operated jewelry store that carried either LeVian or AJaffe.

37. Upon information and belief, Rogers was aware of the exclusivity provisions of Brinker's vendor contracts with both LeVian and AJaffe.

38. Rogers began carrying LeVian and AJaffe subsequent to Brinker's.

39. Upon information and belief, Rogers is not a chain jewelry store which would provide the only exception to the exclusive right of Brinker's to sell LeVian and AJaffe as other jewelry stores carrying the Rogers name in and around Evansville have different ownership. However, upon information and belief, the Defendants falsely represented to LeVian and AJaffe that Rogers is a chain jewelry store.

Advertisement:

40. In 2012, Brinker's paid for and published an advertisement insert with *Evansville Living*. The cover of the insert was designed to look like the outside of the Brinker's "little green box." Inside, the insert contained photographs showing jewelry pieces from various Brinker's vendors and a message from "The Brinker's Family." *See* Exhibit E.

41. In 2013, Brinker's paid for an advertorial in the *Evansville Courier & Press* entitled "Redefining the Jewelry Experience (Exhibit F) and also published "Brinker's Jewelers – The LX Magazine," a sixty-eight (68) page magazine including articles, photography, lifestyle features, vendor advertisements, and more. The LX Magazine included an article about Brinker's redesign campaign entitled, "Redefining the Jewelry Experience," that was first

published in the Evansville Courier & Press in the summer of 2013.  *See* Exhibit G.  Brinker's owners and executives were closely involved with the drafting of many of the articles within the LX Magazine.  On one page of the LX Magazine, an advertisement for Brinker's states, "When you want something different…Think Brinker's!"  *See* Exhibit G, which contains relevant excerpts from the Magazine.

42. In the Winter 2013 issue of *Evansville Woman*, Rogers published an advertisement regarding its grand opening with the taglines "Where the Tri-State Gets Engaged" and "Brilliantly Different."  *See* Exhibit H.

43. Rogers also published an advertisement insert using these taglines in the November/December issue of *Evansville Living*. *See* Exhibit I.

44. The Rogers advertisements in *Evansville Woman* (Exhibit H) and *Evansville Living* (Exhibit I) included very similar text from the Brinker's 2012 advertisement insert (Exhibit E), the advertorial in the *Evansville Courier & Press* (Exhibit F) and the 2013 LX Magazine published by Brinker's (Exhibit G).

45. Specifically and for example, Rogers's advertisements reference the "experience" provided by Roger's and the "spa-like treatments" for jewelry.  Brinker's has had numerous "spa days" for jewelry over the years both prior to and subsequent to Roger's use of "spa-like treatments" in their advertisements.  Brinker's promotes its "Spa Day" events with its customers.

Website

46. Brinker's has operated a website since 2006.

47. The primary domain name for the Brinker's website is www.brinkersjewelers.com ("Brinker's Website").

48.     As early as 2011, Brinker's also owned and registered the domain names www.whereevansvillegetsengaged.com and www.wherethetri-stategetsengaged.com through GoDaddy.com.

49.     On February 13, 2013, Brinker's hired South Central Digital to redesign the Brinker's Website and incorporate search engine optimization.

50.     The new Brinker's Website was published on or about September 30, 2013.

51.     Brinker's and South Central Digital co-own the website and the copyright thereto.

52.     South Central Digital won the American Advertising Federation ("AAF") ADDY Award for the website it designed for Brinker's. An ADDY is the most prestigious award that can be bestowed for website development and design.

53.     Rogers was the subject of an article in the October/November 2013 issue of *Evansville Business*. The article was titled "An Engaging Experience." The article concluded by stating the Rogers website was "in the process of being created." (Exhibit J)

54.     The website for Rogers, found at www.thediamondgalleria.com, includes design, images, text and HTML code (the standard language used to create web pages) copied extensively and often verbatim from the Brinker's website ("Rogers Website"). The extent of the "cut and paste" copying of the text is so blatant and extreme that on the "Colored Diamonds" page of the *Rogers* Website, one of the sentences states, "When buying any diamond, contact a *Brinker's* expert!"

55.     To date, Brinker's has spent tens of thousands of dollars on search engine optimization efforts. The Defendants' duplication of content, features, code, and functionality has caused irrevocable harm in the search-engine rankings and indexing of Brinker's Website. Because content is often deliberately duplicated across Internet domains in an attempt to

manipulate search engine rankings, search engines may adjust the indexing and ranking of the sites involves, causing the site ranking to suffer or even causing the site to be removed entirely from the search index, in which case it will no longer appear in search results.

Social Media

55. As part of its branding and marketing efforts, Brinker's dedicates significant time and resources to utilizing social media, including Facebook, Pinterest, and Instagram.

56. Since the opening of Roger's Diamond Galleria, the Defendants have been intermittently copying Brinker's social media posts and have been posting Brinker's social media posts to Roger's social media sites.

57. For example, in March 2014, Brinker's posted photographs of Henri Daussi rings, a brand carried by Brinker's but not carried by Roger's, to Brinker's Facebook and Pinterest pages. (Exhibit K)

58. On September 24, 2014, Roger's posted Brinker's original post from March, 2014 to Roger's Facebook page. Exhibit L.

59. On August 22, 2014, Brinker's posted a photograph of a 12 ct. yellow diamond ring on the hand of one of its employees ("Brinker's Photograph"). The photograph was taken by Brinker's against the Brinker's Rolex wall within its gallery. The ring depicted in the photograph is a very expensive ring that retails for $450,000 and which is located in the Brinker's vault. *See* Exhibit M. Brinker's also has posted the Brinker's Photograph to its banner on its Instagram page. *See* Exhibit N.

60. On September 23, 2014, Roger's posted the Brinker's Photograph to its Facebook page with the comment, "Look at [sic] this beauty! The Diamond Galleria has the areas [sic]

largest selection of beautiful yellow diamond jewelry.  Make your jewelry truly unique with a splash of color!" *See* Exhibit O.

61. Brinker's monitors its social media marketing with its media partner, South Central Digital.  During its monthly call with South Central Digital, Brinker's learned that its most interactive social media post for the month was associated with the Brinker's Photograph, which Roger's has now copied and posted to its website.

62. Roger's did not have permission or authority to utilize Brinker's Photograph in any capacity, including on Roger's social media network websites.

## COUNT I – COPYRIGHT INFRINGEMENT

56. Plaintiffs incorporate herein by reference each and every allegation contained in each paragraph above.

57. Plaintiffs have registered the Brinker's Website with the United States Copyright Office, which registration is identified as No. VA0001923728, dated September 2, 2014.

58. Plaintiffs are, and at all relevant times have been, the copyright owners under United States copyright law of the Brinker's website, which is the subject of a valid Certificate of Copyright Registration issued by the Register of Copyrights.

59. Among the exclusive rights granted to Plaintiffs under the Copyright Act are the exclusive rights to reproduce the copyrighted works, to distribute the copyrighted works to the public, to display the copyrighted works, and to prepare derivative works based on the copyrighted works.

60. The Defendants do not have, and have never had, any license, authorization, permission, or consent to use, reproduce, distribute, display, or prepare derivative works from Plaintiffs' copyrighted works.

61. As set forth above, the Defendants and/or their agents have reproduced, distributed, displayed, and prepared derivative works from substantial portions of Plaintiffs' copyrighted works and/or works substantially similar to Plaintiffs' copyrighted works without Plaintiffs' authorization, permission, or consent.

62. In doing so, the Defendants have violated Plaintiffs' exclusive rights of reproduction, distribution, derivation, and display.

63. Through their actions, the Defendants have infringed Brinker's copyrights in violation of sections 106 and 504 of the Copyright Act, 17 U.S.C. §§ 106 and 504.

64. The actions of the Defendants are willful, intentional, and purposeful, and were carried out in blatant disregard of and with indifference to Brinker's rights.

65. As a direct and proximate result of Defendants' infringement, Plaintiffs have suffered damages.

66. Pursuant to the Copyright Act, Plaintiffs are entitled to recover their actual damages in an amount to be proven at trial.

67. Plaintiffs are also entitled to any profits of the Defendants attributable to the infringement of Plaintiffs' copyright, pursuant to 17 U.S.C. § 504(b), including an accounting of and a constructive trust with respect to such profits.

68. As a direct and proximate result of the foregoing acts and conduct, Plaintiffs have sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.

69. Because Plaintiffs are subject to substantial, immediate, and irreparable injury for which there is no adequate remedy at law, Plaintiffs are entitled to a preliminary and permanent injunction against further violations of their copyrights in accordance with 17 U.S.C. § 502.

## COUNT II – TRADE DRESS INFRINGEMENT AND UNFAIR COMPETITION UNDER THE LANHAM ACT

70.     Brinker's incorporates herein by reference each and every allegation contained in each paragraph above.

71.     Brinker's has spent substantial amounts of money on its redesign and branding campaign relative to its "little green box," the design of its showroom and showcases, its taglines, and the Brinker's Website.

72.     Brinker's "little green box" and its original tabbed design feature a distinctive appearance ("Tabbed Box Trade Dress").

73.     Brinker's showroom also features a distinctive appearance ("Showroom Trade Dress").

74.     Brinker's Website also contains original and distinctive design elements ("Website Trade Dress").

75.     Brinker's Tabbed Box Trade Dress, Showroom Trade Dress, and Website Trade Dress are distinctive and non-functional and have achieved significant secondary meaning.

76.     The purchasing public has come to associate the Tabbed Box Trade Dress, the Showroom Trade Dress, and the Website Trade Dress with Brinker's.

77.     As a result of Brinker's continuous and exclusive use of its Tabbed Box Trade Dress in connection with its advertisements and merchandise, the Tabbed Box Trade Dress enjoys wide public recognition in the local market in and around Evansville, and has come to be recognized widely and favorably by the public as an indicator of the origin of Brinker's goods.

78.     Similarly, as a result of Brinker's continuous and exclusive use of its Showroom Trade Dress in connection with its merchandise, the Showroom Trade Dress enjoys wide public

recognition in the local market in and around Evansville, and has come to be recognized widely and favorably by the public as an indicator of the origin of Brinker's goods.

79. As a result of Brinker's continuous and exclusive use of its Website Trade Dress in connection with its advertisements and merchandise, the Website Trade Dress enjoys wide public recognition in the local market in and around Evansville, and has come to be recognized widely and favorably by the public as an indicator of the origin of Brinker's goods.

80. As a result of Brinker's extensive use and promotion of its Tabbed Box Trade Dress, Showroom Trade Dress, and Website Trade Dress, Brinker's has built up and now owns valuable goodwill that is symbolized by its Tabbed Box Trade Dress, Showroom Trade Dress, and Website Trade Dress.

81. The tabbed box used by Rogers bears a confusingly similar design to the Tabbed Box Trade Dress.

82. The showroom and the showcases requested and purchased by Rogers for its Diamond Galleria are confusingly similar to the Brinker's Showroom Trade Dress.

83. The website utilized by Rogers is confusingly similar to the Brinker's Website Trade Dress.

84. Rogers has not obtained authorization, permission, or consent to use the original designs of Brinker's with regard to its Tabbed Box Trade Dress, the Showroom Trade Dress, or the Website Trade Dress.

85. Brinker's used the Tabbed Box Trade Dress, the Showroom Trade Dress, and the Website Trade Dress extensively and continuously before Rogers began using confusingly similar tabbed boxes, a confusingly similar showroom and showcases, and a confusing similar website for its own merchandise.

86. The merchandise sold by Rogers is similar to and competes with merchandise sold by Brinker's, and the parties' goods are sold through overlapping channels of trade.

87. The likelihood of confusion, mistake, and deception engendered by Rogers's misappropriation of Brinker's marks and trade dresses is causing irreparable harm to the goodwill symbolized by the Tabbed Box Trade Dress, the Showroom Trade Dress, the Website Trade Dress, and the reputation of Brinker's that they embody.

88. The activities of Rogers are likely to cause confusion before, during, and after the time of purchase because purchasers, prospective purchasers, and others viewing the merchandise of Rogers before, at, or after the point of sale are likely to mistakenly attribute the merchandise to Brinker's. This is particularly damaging to the uniqueness of the Brinker's redesign and branding campaign and Brinker's ability to control the public perception of its brand. By causing such a likelihood of confusion, mistake, and deception, Rogers is causing irreparable harm to the goodwill symbolized by the Tabbed Box Trade Dress, the Showroom Trade Dress, the Website Trade Dress, and the reputation of Brinker's that they embody.

89. Upon information and belief, Rogers knowingly, willfully, intentionally, and maliciously adopted and used confusingly similar imitations of the Tabbed Box Trade Dress, the Showroom Trade Dress, and the Website Trade Dress.

90. The Defendants' aforementioned actions constitute trade dress infringement and unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a), and are likely to cause consumer confusion, mistake, or deception. As a direct and proximate result of Defendants' violations of the Lanham Act, Brinker's has suffered and will continue to suffer loss of income, profits and goodwill, and the Defendants have and will continue to unfairly acquire income, profits and goodwill.

## **COUNT III – COMMON LAW TRADEMARK INFRINGEMENT, UNFAIR COMPETITION, AND DECEPTIVE TRADE PRACTICES**

91. Brinker's incorporates herein by reference each and every allegation contained in each paragraph above.

92. The Defendants' aforementioned actions constitute trade dress infringement, unfair competition, and deceptive trade practices in violation of the statutory and common law of Indiana.

93. The Defendants' aforementioned actions are likely to cause confusion, mistake and/or deception, including but not limited to confusion, mistake and/or deception regarding the source, origin, and/or affiliation of products promoted or sold by Rogers.

94. The Defendants' actions have caused and will continue to cause Brinker's to suffer damages and irreparable injury to its reputation and goodwill.

95. Brinker's has been and will continue to be irreparably damaged unless and until this Court enjoins the Defendants' violations.

## **COUNT IV – CONVERSION**

96. Brinker's incorporates herein by reference each and every allegation contained in each paragraph above.

97. Through their actions, the Defendants knowingly or intentionally exerted unauthorized control over property belonging to Brinker's.

98. Through their actions, the Defendants knowingly or intentionally appropriated the property of Brinker's for their own use and benefit.

99. The Defendants' actions have caused and will continue to cause Brinker's to suffer damages and irreparable injury to its reputation and goodwill.

100. Brinker's has been and will continue to be irreparably damaged unless and until this Court enjoins Defendants' violations.

101. Brinker's is entitled to damages, including treble damages in an amount up to three times the actual damages, time spent to file papers and attend court proceedings, attorneys' fees and costs, under the Indiana Crime Victims' Relief Act, Ind. Code § 34-24-3-1.

## COUNT IV – MISAPPROPRIATION OF ADVERTISING IDEAS AND STYLE OF DOING BUSINESS

102. Brinker's incorporates herein by reference each and every allegation contained in each paragraph above.

103. As set forth above, the Defendants have wrongfully taken and used Brinker's ideas regarding the manner in which Brinker's advertises its goods or services.

104. Through its blatant copying of Brinker's in the multiple and various ways set forth above, the Defendants have also misappropriated Brinker's style of doing business.

105. The Defendants' actions have been willful and intentional.

106. The Defendants' actions have caused and will continue to cause Brinker's to suffer damages and irreparable injury to its reputation and goodwill.

107. Brinker's has been and will continue to be irreparably damaged unless and until this Court enjoins the Defendants' violations.

## COUNT V – TORTIOUS INTERFERENCE WITH CONTRACT OR BUSINESS RELATIONSHIP

108. Brinker's incorporates herein by reference each and every allegation contained in each paragraph above.

109. Brinker's had valid and enforceable contracts with LeVian and AJaffe containing exclusivity provisions.

110. Upon information and belief, the Defendants were aware of these contracts as well as their validity and enforceability before the Defendants entered into vendor agreements with LeVian and AJaffe.

111. Upon information and belief, the Defendants intentionally induced LeVian and AJaffe to breach the exclusivity provisions of their contracts with Brinker's.

112. No justification existed for the Defendants' actions.

113. Brinker's suffered damages resulting from the Defendants' tortious interference with its contacts with LeVian and AJaffe.

**WHEREFORE**, Plaintiffs pray for a judgment against the Defendants Rogers, Wheat, and Sartore, jointly and severally, for actual or statutory damages in such amount as may be found, or as otherwise permitted by law, for an accounting of, and the imposition of a constructive trust with respect to, the Defendants' profits attributable to their infringement of Brinker's copyrights and trade dress and unfair competition violations, for a preliminary and permanent injunction prohibiting the Defendants, and their respective agents, servants, employees, officers, successors, licensees, and assigns, and all persons acting in concert or participation with each or any of them, from continuing to infringe Brinker's copyrights and violate Brinker's rights to its intellectual property pursuant to the Lanham Act and common law, for treble or punitive damages as allowed by law, for prejudgment interest as permitted by law, for Brinker's attorneys' fees, costs, and disbursements in this action, and for such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Brinker's hereby demands a trial by jury on all counts.

        Respectfully submitted,

        ZIEMER, STAYMAN, WEITZEL & SHOULDERS, LLP

        By: s/ *Jean M. Blanton*_____
            Nick J. Cirignano, Indiana Bar #22927-53
            Jean M. Blanton, Indiana Bar #24840-82-A
            Molly E. Briles, Indiana Bar #30543-49
            20 N.W. First Street
            P. O. Box 916
            Evansville, IN  47706-0916
            (812) 424-7575

        ATTORNEYS FOR PLAINTIFFS